## 35019. DICKEY *v.* SUGGS.

DECIDED MAY 11, 1954.

*T. J. Long, Nick Long,* for plaintiff in error.

*Northcutt & Edwards,* contra.

FELTON, C. J. We do not believe that a landlord can relieve himself of his duty to the general public in respect to the condition of his property by fully parting with possession and failure to retain the right to enter, inspect, and repair. However, we need not enter into a discussion of this principle because in the instant case it does not appear that the landlord fully parted with the possession of her property and failed to retain her right to enter, inspect, and repair the premises; and in such a case she was under a duty as to the plaintiff to exercise ordinary care in making reasonable inspections of the premises and in repairing the defects which were discovered or should have been discovered in the exercise of ordinary care. *City of Dalton* v. *Anderson,* 72 *Ga. App.* 109, 112 (33 S. E. 2d 115).

A portion of the evidence in the case is as follows: Mr. R. W. Fitzpatrick testified in part as follows: "I have lived in College Park about fifty years. I am a commercial photographer. . . Plaintiff's exhibit number one, which you show me, is a picture of the lower sash in a window on the second floor. Plaintiff's exhibit number three is a picture of the front of the building outside. I took both of those pictures. Plaintiff's exhibit number three was made in the month of May of this year. Plaintiff's exhibit number one was made in October, 1952, about the latter part of October. Plaintiff's exhibit number two, which you show me, is practically the same picture as plaintiff's exhibit number one. It is a picture of the same window. That picture was made in October, 1952. Plaintiff's exhibits one and two are pictures of the first window north of and to the right of the entrance of the building. The stairway goes upstairs and there is an awning over it and a sign. Plaintiff's exhibits one and two is the first window to the right on the second floor. At the time pictures shown in plaintiff's exhibits one and two were made in October, 1952, the bottom sash of the window was rotten and the glass was loose; looked like it was just about to fall out. As to whether there was any wood in the window shown on plaintiff's exhibit number one when I took that picture; part of the bottom sash was loose."

The defendant testified in part: "I do not know anything about the repairs that were made to the window shown in the picture which you exhibit to me, because my husband has always managed the property and taken care of the repairs. As to whether any repairs made to the window were made at my direction by my husband; not by my direction; if anything was done, it was done by my husband. I am a semi-invalid, and I really don't know anything about it. I just left the matter of the management of this building up to my husband and he has always managed it. . . As to whether I have been out to these premises in the last year; yes, I rode out one time. I did not observe anything unusual in regard to the window you are talking about; I did not go for that purpose. It was a couple of months ago that I was out there."

Mary Morgan testified in part: "I think I have been working here in this building about four years. I was working here on

the morning of September 5, 1952. As to whether anything usual [sic] happened on that date; just a window sill fell out. I was cleaning out the bottom of the desk where the typewriter is, and there was a whole lot of trash up under there, and they had the typewriter out and it was open down there and I was trying to clean it out, and wind was coming in the window. I merely turned around, took hold of it to pull it down, and the thing went off and I looked out the window and there was the people. I just turned around and went down the steps. When I got down there the lady was standing out there in the street. She turned around and said the stick almost knocked her down to the ground. . . The window in the building where the bottom sash fell out is in the east, back there (indicating). It is the front of the building. When this piece of wood fell, it fell down there on the sidewalk. When I went down there to the sidewalk, I didn't do anything but just pick up the stick and come back upstairs. There wasn't any other stick or object down there on the ground that I know of. I brought the stick back and set it up there in the corner. . . Plaintiff's exhibit number two, which you show me, is a picture of that front window that the stick fell out. The stick that fell is this one (indicating) because it has got them little things to it where you catch hold to pull it up and pull it down with. . . With regard to plaintiff's exhibit number one, I think that is a piece of that sill, from that window over there that fell out. . . There was no screen or rail to keep it from falling out the window. There wasn't nothing between the window and the ground."

Mrs. Ruth Patten testified in part: "On the morning of September 5, 1952, I was standing talking to a customer at my door, and I went out and looked, and a lady was down on her knees. She told me it was Mrs. Suggs. I did not see anything fall myself. . . I brushed some rotten wood off Mrs. Suggs' shoulder and asked her not to walk up the steps, but she did. I went into the building to answer the phone and when I came back she had gone upstairs. I looked up there when I came back out and you could not help but see the place where this rotton wood came from. When I came out the first time, the lady was down on one knee, and the window sash was lying back of her

on the ground. It was a whole complete sash from the bottom of a window, and one side of it was all decayed and rotten and broken up on the street. . . When I looked at the first window to the north of the canopy immediately after this took place it did not have a bottom piece across the sash. That was upstairs in the second story window. I think I would recognize the piece that fell out if I saw it. That (indicating on plaintiff's exhibit number one) looks like the piece that I saw on the ground. It shows a rotten sash at the bottom, lying on a platform right there (indicating)."

The jury was authorized from this testimony and the exhibits introduced in evidence to find that the window and especially the bottom portion of the sash thereof was in such a rotten and unsafe condition as would have been discovered by the exercise of ordinary care had a reasonable inspection been made, and that the defendant was negligent in not making a reasonable inspection, or, if one was made, in not discovering and repairing the defect.

The fact that Mary Morgan testified: "When I got ready to pull it [the window] down, I didn't notice anything unusual that would make it look dangerous. If I had thought it was in that shape, I wouldn't have pulled on it or touched it. When I pulled out on it, it tore loose and came out and fell to the street. I had no notice or warning that it was going to take place. If I had I would not have touched it," does not show that a reasonable inspection of the premises by the landlord using ordinary care would not have revealed the defective condition of the window. A landlord is required, in a case like this, to make more than a cursory examination to ascertain the condition of his premises. A defect not ascertainable by a cursory examination might be discoverable by the exercise of ordinary care during an inspection made by a landlord.

The court did not err in overruling the motion for new trial, based on the general grounds.

*Judgment affirmed. Quillian and Nichols, JJ., concur.*